Filed 2/24/15  P. v. Lozano CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060100 |
| v. | (Super.Ct.No. RIF1204341) |
| NELSON URIEL LOZANO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.
Affirmed.

Nancy S. Brandt, under appointment by the Court of Appeal, for Defendant and
Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General,
Charles D. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and
Respondent.

A jury convicted defendant and appellant Nelson Uriel Lozano of being a felon in possession of a firearm (Pen. Code,[1] § 29800, subd. (a)(1)), discharge of a firearm in a grossly negligent manner (§ 246.3), and being a felon in possession of ammunition (§ 30305, subd. (a)). Defendant admitted having a 2008 conviction for willful discharge of a firearm (§ 246.3), which constitutes a prior strike (§§ 667, subds. (c) & (e)(1), 1170.12, subd. (c)(1)). The trial court sentenced defendant to four years in state prison on the section 246.3 conviction,[2] along with a four-year concurrent sentence on the conviction for possession of a firearm. The sentence on the conviction for possession of ammunition was stayed. (§ 654.)

On appeal, defendant contends that the conviction under section 246.3 is not supported by substantial evidence that defendant discharged a firearm in a manner that was grossly negligent because the only eyewitness to the shooting saw defendant aiming nowhere but at the ground. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On the day defendant committed the offenses described above, a gathering of approximately 15 people, including approximately seven children, was occurring in the backyard of a residence located behind defendant's house. Guests at the party heard what sounded like someone shooting a gun in defendant's backyard. After four of five shots,

---

[1] Unless otherwise specified, all statutory references are to the Penal Code.

[2] This sentence was comprised of the middle term of two years, which time was doubled because of defendant's prior strike.

2

the shooting ceased for 10 minutes or so but was then followed by another four to six shots. The terrified attendees of the party ran inside. When a third round of shooting began, one of the guests, who testified at trial, went to a second-floor window and saw defendant firing a gun in his backyard. At the time, defendant was shooting into the ground, which was "mostly dirt."

Deputies from the Riverside County Sheriff's Department responded to at least one call that shots were being fired. After scaling fences and running through backyards to locate where the shooting was occurring, a field supervisor determined that the shots were coming from defendant's residence.

Investigating officers established a perimeter around defendant's residence and began trying to contact whoever was inside. Defendant exited his house while carrying his child. The field supervisor testified that, "[f]rom the outset," defendant "was uncooperative and appeared to be under the influence of alcohol." Another investigating officer testified that defendant was "angry and agitated" and kept asking, "How can I help you?" Yet another officer described defendant as "combative." Defendant refused to obey commands from law enforcement, such that officers had to "t[ake] him to the ground." Once placed in a patrol vehicle, defendant began kicking the windows and doors. Defendant even spat on an investigating officer when he opened one of the patrol vehicle's doors for an in-field identification.[3]

---

[3] Defendant testified that he had been kicking the windows because an officer had left the vehicle's heater on, and that he only spit on a different officer because that person had threatened to take defendant's child away.

3

After entering defendant's backyard, the field supervisor and other investigators found 15 or 16 shell casings "just spread out all over the place." Officers uncovered no evidence that bullets had ricocheted off of or come to a stop in fences, trees, or houses in the area. However, one of the investigating officers explained to the jury that, "if you miss your target, those bullets are going to continue traveling in whatever direction they're headed, and there is a potential that other people could be harmed."

Officers also recovered a .45-caliber weapon and live ammunition from a closet inside the master bedroom in defendant's residence. A surveillance video captured defendant entering and leaving his house on the night of the shooting. It showed defendant carrying the semiautomatic handgun, which was loaded with an extended clip. The video also showed some muzzle flashes from when the weapon was fired.

At trial, defendant asserted a self-defense theory. He and his wife both testified that they lived in a bad neighborhood and did not feel safe in their home. In fact, defendant's wife explained that she had retrieved the gun defendant fired from her parent's house in order to have it for self-protection because a series of crimes had taken place at or near the home she shared with defendant.

For his part, defendant testified that he started shooting on the night in question because he saw a man dressed all in black on a sliding board ladder in a lot behind his property. The ladder protruded slightly over defendant's fence. It was dark at the time of the shooting, but defendant indicated he could see "shadows" of the intruder from his backyard. Defendant admitted that he did not speak to the purported intruder, as well as

4

that the black-clad man did not speak to him; defendant "pretty much start[ed] shooting."

Defendant stated he then returned inside the house to check on his eight-month-old son.

He also reloaded his weapon at that time. When he went back into the yard, defendant

allegedly saw two men in black on the ladder and again started shooting. He testified he

again checked on his child and reloaded, and then returned to the yard. On the third and

final time, defendant claimed, the two men in black yelled "Rolling 60s Crips."

Defendant's response was to shoot again, emptying an extended magazine.

Defendant agreed it was "safe to say" that he shot a total of "about 16" rounds and

admitted he never called 911, despite having fired his gun multiple times on three

separate occasions. He also admitted knowing that some type of party was happening,

but he claimed he was shooting toward the side of the yard opposite the gathering. In

fact, defendant testified that he had specifically aimed for but simply failed to strike the

intruder. He was also quite clear that he had intentionally discharged his weapon, and

that he knew at the time that he could kill or injure the purported intruders.

Defendant further testified that he had consumed five beers in approximately four

hours before he first fired the gun. However, according to defendant, inebriation "in no

way affected the events that occurred" on the night he discharged a firearm in his yard.

ANALYSIS

Defendant's sole contention on appeal is that the People failed to present

substantial evidence that he fired a weapon in a grossly negligent manner. He reasons

that, because the jury did not believe his self-defense theory, the only evidence of how

5

the shooting took place came from the eyewitness at the neighbors' party, who saw defendant do no more than harmlessly shoot into the ground. As we explain *post*, we view the matter differently.

"[T]he elements of section 246.3[, subdivision] (a) are: '(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person.' [Citations.]" (*People v. Ramirez* (2009) 45 Cal.4th 980, 986 (*Ramirez*).) To prove that a defendant's discharging of a firearm was grossly negligent, the People must prove " ' " 'such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' " ' " (*Id.* at p. 989.) However, the People need not show that a specific, identifiable person is in danger, as long as they "prove it was reasonably foreseeable that human injury or death might result under the circumstances." (*Id.* at p. 990.) "The risk element requires the likely presence of people in the area, not the actual presence of a specific person. Requiring the prosecution to prove a particular person was present is impractical and was never intended." (*Id.* at p. 987.)

In reviewing defendant's claim that proof of an essential element was lacking, "we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 509,

6

italics in original.)  In the course of this inquiry, we " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*Ibid*.)

As we have indicated, defendant admitted that he discharged a semiautomatic firearm multiple times in a backyard next to a party.  It was dark at the time, and defendant admitted he had been reacting to mere shadows.  Moreover, he had consumed five beers in four hours before he began firing.  One of the investigating officers testified that defendant appeared to be intoxicated, and the combative nature of his interactions with law enforcement supports this conclusion.  Because defendant need not have aimed at a particular individual (*Ramirez*, *supra*, 45 Cal.4th at pp. 987, 990), these facts support a conclusion that the way in which defendant fired his weapon was reasonably likely to cause death or injury to another human.

Defendant insists his conviction cannot stand because the only evidence about the shooting that was not related to his self-defense theory proved only that he shot into the ground, which seems harmless.  This contention ignores the rule from *Ramirez* that section 246.3 does not require the presence of a specific, identifiable person in the area of the shooting.  (*Ramirez*, *supra*, 45 Cal.4th at pp. 987, 990.)  Moreover, testimony that investigating officers searched the nearby fences, trees, or houses for ricochet marks informed the jury that bullets can travel away from their intended paths.  One of these officers also testified that bullets that miss their intended targets keep traveling and may cause injuries.  From these statements, a reasonable jury could have concluded that a

bullet fired into the ground could nevertheless end up somewhere that could cause injury.[4]  It also could have found that bad aim on defendant's part, especially in light of his intoxication, could easily have caused a bullet to fly toward the party and far from where defendant had aimed the gun.[5]

In any event, in this case defendant's own testimony provided additional evidence that a violation of section 246.3 had occurred.  Defendant assumes the jury must have completely discredited his testimony about the presence of intruders simply because it convicted him and therefore did not accept that he proved a complete defense.  However, the trial court instructed that defendant's self-defense theory could only succeed if the jury found that he used no more than the amount of force that was reasonably necessary to guard against the harm.  Because defendant gave no warning before he began firing and because he never called the police about the purported intruders, the jury could have reasonably concluded that, even if defendant really did see intruders, he used more force than necessary to protect himself and his son.  On the unique facts of this case, defendant's admission that he intentionally aimed at the intruders with knowledge that he

---

[4]  Defendant insists that a dangerous ricochet could not have occurred without leaving a mark on nearby walls or fences.  As he cites no evidence in support of this assertion, we do not consider it.

[5]  Defendant also stresses that he testified to shooting in the opposite direction of the yard with the party.  Since his aim could have been inaccurate, this fact is irrelevant, even if it is true.

could injure or kill them[6] provided the jury with rather convincing evidence that he had discharged a weapon, intentionally, " 'in a grossly negligent manner which could result in the injury or death of a person.' [Citation.]" (*Ramirez*, *supra*, 45 Cal.4th at p. 986.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

McKINSTER
J.

---

[6] This testimony establishes that defendant was aiming at at least one other human being when he fired at least some of the rounds. It is therefore immaterial that the eyewitness who attended the neighboring party only saw defendant during the third round of shots.